IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| BENE VIERA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:19-cv-00901 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| THE GENERAL AUTOMOBILE | ) | |
| INSURANCE SERVICES and | ) | |
| PERMANENT GENERAL ASSURANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the Court are two motions.[1] Defendants filed a Motion to Dismiss Retaliation Claim (Doc. No. 33, "Defendants' Motion"). Plaintiff responded, (Doc. No. 43), and Defendants replied. (Doc. No. 47). Plaintiff filed a Motion to Dismiss Counterclaims (Doc. No. 41, "Plaintiff's Motion"). Defendants responded (Doc. No. 46) and Plaintiff did not reply. The Motions are ripe for Review.

For the reasons discussed, the Court will deny Defendants' Motion, and the Court will deny Plaintiff's Motion.

## BACKGROUND[2]

---

[1] Also pending is Plaintiff's Motion to Disqualify Counsel (Doc. No. 35), to which Defendants responded, (Doc. No. 44), and Plaintiff replied. (Doc. No. 48). The Court does not rule upon that motion in the present opinion.

[2] The facts in this subsection A are taken from the First Amended Complaint (Doc. No. 32) and are taken as true for the purposes of Defendants' Motion, except as indicated in the final sentence in this footnote. The First Amended Complaint is the operative Complaint in this matter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000). The facts in this subsection B are taken from the counterclaims in Defendants' Second Amended Answer (Doc. No. 40) and

1

A.  <u>Plaintiff's First Amended Complaint</u>

Plaintiff is a former employee of Defendants. (Doc. No. 32 at 2). Plaintiff, an African-American woman, was hired in May 2019 to be a Corporate Communications Specialist for Defendants. (*Id.* at 2). Plaintiff worked under the supervision and direction of the Senior Vice President of Marketing. (*Id.* at 3).

In June 2019, Plaintiff emailed the Employee Relations manager regarding incidents of racial and gender discrimination. (*Id.* at 3). In her email, Plaintiff recounted specific incidents that she believed were discriminatory, and also stated that she feared retaliation from the company. (*Id.*). Defendants informed Plaintiff that there would be an investigation into her complaint. (*Id.* at 4).

Plaintiff received positive performance reviews prior to the email. (*Id.* at 2). But after she sent the email, according to Plaintiff, her supervisor and others targeted her with hostility and discrimination. (*Id.* at 4). Some of the specific conduct alleged includes hostility during daily interactions, criticisms of Plaintiff's tone and demeanor, solicitations of negative feedback related to Plaintiff, and denying Plaintiff a promised office and other privileges. (*Id.* at 4). Plaintiff followed up regarding her previous complaint in July 2019 and indicated some new issues, and she was informed that an investigation was underway. (*Id.*). The Senior Vice President of Marketing was included on this email. (*Id.*). After being included on the email, she showed increased hostility and antagonism towards Plaintiff, informing Plaintiff that since Plaintiff was

---

are taken as true for the purposes of Plaintiff's Motion. *See Dassault Systemes, SA v. Childress*, 828 F. App'x 229, 233 n.1 (6th Cir. 2020). Certain allegations are not accepted as true, because they are merely conclusory factual allegations or are legal conclusions; such allegations are identified by the qualifying language "according to [Plaintiff or Defendants, as the case may be]."

her "first hire," Plaintiff's complaints cast both the Senior Vice President of Marketing and their division in a negative light. (*Id.* at 4-5).

At a meeting in August 2019 regarding the investigation, the Senior Vice President of Marketing was in attendance, was hostile to Plaintiff, and stated that she did not think she would be able to work with Plaintiff anymore. (*Id.* at 5-6). Plaintiff was informed that her complaint was unsubstantiated and that no corrective action would be taken. (*Id.* at 5). Plaintiff raised additional concerns about discrimination and retaliation at the meeting. (*Id.* at 6). Plaintiff was fired a week later. (*Id.* at 6).

During the one-week period after the meeting but before Plaintiff's firing, the Senior Vice President of Marketing solicited negative feedback about Plaintiff and acted in a hostile manner towards her. (*Id.*). At Plaintiff's termination meeting, the Senior Vice President of Marketing showed hostility towards Plaintiff because of her complaints and indicated that her complaints showed "poor performance." (*Id.*). On the separation paperwork, Defendants listed "poor performance" as the reason for Plaintiff's termination. (*Id.*).

Plaintiff filed her original Complaint in October 2019, bringing claims for 1) retaliation in violation of the Tennessee Human Rights Act ("THRA"), and 2) retaliation in violation of 42 U.S.C. § 1981 ("§ 1981"). (Doc. No. 1). In February 2020, Defendants' counsel emailed Plaintiff's counsel and stated that Defendants were considering filing counterclaims against Plaintiff, including for criminal impersonation. (Doc. No. 32 at 7). Defendants' counsel stated that Defendants were willing to sign mutual releases if Plaintiff was willing to drop the lawsuit. (*Id.*). Plaintiff believes this to have been a threat, and that the threat to file counterclaims was a retaliatory response to her Complaint. (*Id.*). Defendants then moved to amend and correct the Answer to include counterclaims. (*Id.*). Plaintiff thereafter filed the First Amended Complaint.

Plaintiff's First Amended Complaint, like her original Complaint, brings claims for 1) retaliation in violation of the THRA, and 2) retaliation in violation of § 1981.[3]

B. Defendants' Counterclaims[4]

Defendants own and maintain a LinkedIn account, used to promote Defendants' business and services. (Doc. No. 40 at 9). While Plaintiff worked for Defendants, she acquired credentials that allowed her to access and modify Defendants' LinkedIn page. (*Id.* at 10). After Defendants terminated Plaintiff on the afternoon of August 16, 2019, she intentionally accessed the LinkedIn page without authorization and using credentials she was not permitted to use after her firing. (*Id.*). Plaintiff deleted and altered content on the LinkedIn page, including removing Defendants' trademark logo and replacing it with a large image of the "N word" and posting derogatory statements about Defendants' employees and business practices. (*Id.*). Plaintiff publicly identified two of Defendants' employees by name, accusing each of racist conduct. (*Id.* at 10-11).

---

[3] At times herein, the Court will refer to Plaintiff's "claims of retaliation," for the sake of emphasis on the nature of her claims. The Court does so to emphasize the nature of her claims. It does not do so to distinguish her claims of retaliation from claims of some other kind that she has brought; in fact, Plaintiff has brought no claims that are *not* claims of retaliation.

[4] As noted above, Defendants moved for leave to amend their answer and to file counterclaims. (Doc. No. 19). Such leave was granted, (Doc. No. 30), and Defendants thus filed a pleading styled, "Amended Answer and Counterclaim of Permanent General Assurance Corporation" (Doc. No. 31), which included the two counterclaims described herein. (Doc. No. 31). Then, after Plaintiff filed her First Amended Complaint (Doc. No. 32), Defendants answered it in a pleading styled, "Second Amended Answer and Counterclaim of Permanent General Assurance Corporation to Plaintiff's First Amended Complaint" (Doc. No. 40, "Second Amended Answer"), which reiterated verbatim the same two counterclaims previously asserted. Notably, though titled only in the name of one of the two Defendants, the Court construes the defense pleadings as filed on behalf also of Defendant The General Automobile Insurance Corporation.

Defendants' two counterclaims are brought, respectively, under 1) the Computer Fraud and Abuse Act ("CFAA"), and 2) the Tennessee Personal and Commercial Computer Act ("TPCCA").[5]

## LEGAL STANDARD[6]

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all as true of the factual allegations in the complaint.[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 1950. A legal conclusion, including one

---

[5] Defendants did not bring (and could not properly have brought) a claim under the Tennessee statute for criminal impersonation, despite (according to Plaintiff) indicating that they would do so in emails to Plaintiff's counsel. (Doc. No. 32 at 7).

[6] The Court notes that as part of her discussion of the applicable standard, Plaintiff claims that "[a] claim should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " (Doc. No. 43 at 7 (quoting and citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) and *Lillard v. Shelby County Bd. Of Educ*., 76 F.3d 716, 724 (6th Cir. 1996))). Strangely, Plaintiff claims that the *Conley* standard applies only in her Response to Defendants' Motion, and not in her memorandum in support of her own Motion, where she instead references *Twombly* and *Iqbal*. It is inappropriate to invoke this standard because *Conley* was supplanted by *Twombly* and *Iqbal*, and it has thus been "retired" since *Lillard* was decided. *See Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629–30 (6th Cir. 2009). As *Twombly* put it, the *Conley* "no set of facts" standard has "earned its retirement" and "is best forgotten as an incomplete, negative gloss on an accepted pleading standard. Thus, litigants no longer should "rel[y] on the now defunct *Conley* standard for motions to dismiss." *Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of the U.S.A.*, 770 F.3d 414, 427 (6th Cir. 2014) (citation omitted).

[7] What is said in this section regarding a "complaint" applies likewise to any counterclaim.

couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

In reviewing a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

Importantly, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993),[8] is inapplicable on a Rule 12(b)(6) motion to dismiss. That is to say, a plaintiff need not allege facts specifically indicating that the plaintiff could carry the burden she might ultimately

---

[8] The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* framework as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

7

bear under *McDonnell Douglas*. This is because *McDonnell Douglas* "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). Contrary to what Plaintiff seems to assume, (Doc. No. 43 at 9), a plaintiff is not required to plead what would qualify as a *prima facie* case for purposes of *McDonnell Douglas*. *See, e.g.*, *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) ("The district court's requirement that [the plaintiff's] complaint establish a *prima facie* case under *McDonnell Douglas* and its progeny is contrary to Supreme Court and Sixth Circuit precedent."); *Clough v. State Farm Mut. Auto. Ins. Co.*, No. 13-2885-STA-tmp, 2014 WL 1330309, at *6 (W.D. Tenn. Mar. 28, 2014) ("In light of *Swierkiewicz*, the Court concludes that strictly speaking Plaintiff need not plead all of the elements of the *prima facie* case in order to survive a motion to dismiss."). The Court recently explained this in some detail in resolving a motion to dismiss a plaintiff's THRA claims:

> But since this is a Motion to Dismiss, and not a motion for summary judgment, Plaintiff is not required to carry a burden of presenting evidence establishing a *prima facie* case under *McDonnell Douglas. Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012). *McDonnell Douglas* "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510-11 (2002). "[T]he precise requirements of a *prima facie* case can vary depending on the context and before discovery has unearthed the relevant facts and evidence, it may be difficult to define the appropriate formulation. Significantly, the Supreme Court identified the possibility that discovery may produce direct evidence of discrimination, rendering the *McDonnell Douglas* burden-shifting framework inapplicable to a plaintiff's claims." *Keys*, 684 F.3d at 609 (discussing *Swierkiewicz*) (internal citation omitted).

> This only stands to reason. After all, the *McDonnell Douglas* framework contemplates that a defendant can, if necessary, attempt to prevail by setting forth its position on a factual issue (*i.e.*, as to the existence of a legitimate, non-discriminatory reason for its challenged employment actions). 411 U.S. at 802. But except perhaps in a very limited sense (as for example when a district court will consider, if uncontradicted in a plaintiff's reply brief, a defendant's factual assertions as to the content in a document referred to in the plaintiff's complaint) a defendant's position regarding the facts simply is not be considered on a Rule 12(b)(6) motion to dismiss. *See Burns v. United States*, 542 F. App'x 461, 466-67 (6th Cir. 2013). Therefore, the *McDonnell Douglas* framework does not apply on this Motion, and Plaintiff is not required here to make out a *prima facie* case as

8

required by *McDonnell Douglas* on a motion for summary judgment; instead Plaintiff must satisfy the plausibility requirement for a motion to dismiss.

*Jodry v. Fire Door Sols., LLC*, No. 3:20-cv-00243, 2020 WL 7769924, at *3–4 (M.D. Tenn. Dec. 30, 2020) (Richardson, J.). So as noted in *Keys*, *McDonnell Douglas* ultimately may not apply at all in a particular case; in particular it would not apply if the plaintiff can rely on direct evidence of discrimination, rather than indirect evidence of discrimination (which is what *McDonnell Douglas* deals with). And even if *McDonnell Douglas* would apply at later stages of the case, it cannot sensibly be applied at the pleading stage, and so its requirement of a showing of a *prima facie* case must not be applied at the pleadings stage.

## DISCUSSION

### A. Defendants' Motion

42 U.S.C. § 1981 and the Tennessee Human Rights Act ("THRA")[9] prohibit discrimination based on race that creates a hostile work environment. Although Plaintiff brings claims under both § 1981 and the THRA, the Court need conduct only one analysis. *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 2927983, at *3 (M.D. Tenn. May 19, 2016).

---

[9] The THRA provides a state remedy for race discrimination. The statute states that "[i]t is a discriminatory practice for an employer to: (1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin . . . " Tenn. Code Ann. § 4-21-401(a)(1). Though this is a state discrimination law, courts apply the same principles as they would to a claim brought under Title VII or 42 U.S.C. § 1981. *See e.g.*, *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) ("The stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act." (internal citations omitted)). It is true that the THRA is broader than Title VII in some respects, *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *5 (M.D. Tenn. Apr. 2, 2020), but not any that are relevant to the analysis in this case.

9

Defendants claim that Plaintiff's retaliation claim, which was included in Plaintiff's Amended Complaint, fails to state a claim upon which relief can be granted. (Doc. No. 34 at 1). Defendants specify that they are moving to dismiss Plaintiff's retaliation claim only to the extent it is based upon Defendants filing counterclaims against Plaintiff. (Doc. No. 33 at 2). Defendants put forth two arguments for dismissing Plaintiff's retaliation claim to the extent it is based on Defendants' counterclaims: 1) she has not sufficiently pled that the counterclaims were baseless or filed in bad faith, and 2) the counterclaims are compulsory. (*Id.* at 1-2). Plaintiff argues that Defendants' argument that she did not plead that their counterclaims were baseless or made in bad faith should be ignored because baselessness/bad faith is not a part of the *prima facie* case.[10] (Doc. No. 43 at 1). Plaintiff alternatively argues that she did, in fact, plead that the counterclaims were baseless or in bad faith. (Doc. No. 43 at 11). Finally, Plaintiff argues that Defendants' claim is not compulsory. (Doc. No. 43 at 14).

As a preliminary matter, the Court aims to clarify what Defendants are moving the Court to dismiss. In a footnote in Defendants' Motion, Defendants state:

> For ease of reference, Defendants are only moving to dismiss Plaintiff's retaliation claim in her First Amended Complaint based on The General's filing of its counterclaims against her. Defendants are not, in any way, admitting that the remaining claims have merit, but only recognize that they must accept Plaintiff's allegations as true for purposes of a Rule 12 Motion . . . The causes of action in the Amended Complaint are identical to those filed in the first Complaint. The only change between the two is the addition of factual allegations in paragraphs 34-42.

(Doc. No. 33 at 2 n.1). As noted by Defendants, Plaintiff does not bring a new claim in her First Amended Complaint; instead, she has only added additional factual allegations (in nine new

---

[10] As the Court has discussed and will discuss further, Plaintiff is not actually required to plead a *prima facie* case.

paragraphs) supporting her claims of retaliation.[11] So, Defendants apparently are moving to dismiss Plaintiff's retaliation claims only to the extent that they rely upon the factual matter she

---

[11] The entirety of Plaintiff's additions in her First Amended Complaint constitute paragraphs 34-42:

> 34. On February 13, 2020, Defendants counsel, Aron Karabel of Waller, told counsel for Plaintiff that Defendants were considering filing counterclaims against Ms. Viera for, *inter alia*, criminal impersonation under T.C.A. 39-16-301(a).

> 35. T.C.A. 39-16-301(a) is a Class A criminal offense, exposing persons alleged to criminal penalties.

> 36. On March 5, 2020, Defendants counsel, Aron Karabel of Waller, informed Plaintiff's counsel that Defendants were planning on filing a motion to amend to add counterclaims on Monday, March 9, 2020.

> 37. The March 5, 2020 communication threatened Plaintiff that, unless she were willing to drop the pending action, that Defendant would move to file counterclaims against her. Specifically, the March 5, 2020 communication from Mr. Karabel stated that, *"My client is offering to sign mutual releases **if yours is willing to dismiss the pending lawsuit**."*

> 38. Defendants threat to file [disputed] counterclaims were received as and intended to be retaliatory, antagonistic, and adverse to ethical and professional standards precluding a lawyer from threating to present criminal charges to gain an advantage in a civil action.

> 39. Defendants threats to file counterclaims were received as a retaliatory response against Plaintiff for engaging in the protected acts of complaining about discrimination, filing a Charge of Discrimination with the EEOC, and initiating a lawsuit related to the violations of her statutory rights against The General/Defendant.

> 40. After correspondence related to the threats to file counterclaims, including criminal claims as referenced earlier, Defendant moved to Amend/Correct to include counterclaims under federal and state laws. The filing of Defendants counterclaims were a retaliatory response against Plaintiff not agreeing "to dismiss the pending lawsuit" and other protected acts.

> 41. Defendant's actions were willful, malicious, and demonstrated reckless indifference to Plaintiff's right to work in an environment free from discrimination and retaliation.

11

added in her First Amended Complaint—*i.e.*, as to alleged retaliation in the form of Defendants'

filing of counterclaims (as opposed to alleged earlier retaliation in the form of her termination).

### 1. Sufficiency of Plaintiff's retaliation claim

Defendants argue that "Plaintiff has not alleged facts that, if true, would show that The

General's counterclaims are baseless or filed in bad faith." (Doc. No. 34 at 5). Defendants support

their argument by citation to information received in their investigation into the alleged misuse of

the LinkedIn account. (*Id.* at 8). Plaintiff responds that she has appropriately pled her *prima facie*

case (which she claims does not include showing that the counterclaim was baseless), and that, in

the alternative, she has shown that the counterclaims are baseless. (Doc. No. 43).

This Court finds persuasive the court's reasoning in *Robillard v. Opal Labs, Inc.*, 337 F.

Supp. 3d 962, 975 (D. Or. 2018), where a defendant argued that the plaintiff's proposed retaliation

claims should not be allowed under Fed. R. Civ. P. 15 because (according to the defendant) they

were delayed, futile, and prejudicial:

> Regarding futility, first, the Court agrees with the significant weight of
> authority holding that a counterclaim filed in ongoing litigation can serve as an
> adverse action to support a retaliation claim, many of which rely on the Supreme
> Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548
> U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006), and many of which include
> claims under the FLSA. *See Romero v. Bestcare, Inc.*, 2018 WL 1702001, at *6
> (E.D.N.Y. Feb. 28, 2018), *report and recommendation adopted*, 2018 WL 1701948
> (E.D.N.Y. Mar. 31, 2018); *Desio v. Russell Rd. Food & Beverage, LLC*, 2016 WL
> 4721099, at *7–8 (D. Nev. Sept. 9, 2016); *Romero v. Allstate Ins. Co.*, 2016 WL
> 3654265, at *14 (E.D. Pa. July 6, 2016); *Wilder v. New Albany Health Assocs. Mso,*

---

42. Defendant's conduct has caused Ms. Viera to suffer a substantial loss of income
and other privileges and benefits of employment; caused her to incur medical
expenses that she otherwise would not have; and caused her to suffer
embarrassment, humiliation, emotional distress, mental anguish, stress, anxiety,
exacerbation of medical conditions, damage to her reputation, inconvenience, and
loss of enjoyment of life. Additionally, Plaintiff has incurred attorneys' fees, costs,
and related litigation expenses.

(Doc. No. 32 at 7-8).

*LLC*, 2015 WL 5244463, at *2–3 (S.D. Ohio Sept. 9, 2015); *Parry v. New Dominion Const., Inc.*, 2015 WL 540155, at *7 (W.D. Pa. Feb. 10, 2015); *Carr v. TransCanada USA Servs., Inc.*, 2014 WL 6977651, at *2–3 (M.D. Tenn. Dec. 8, 2014); *Flores v. Mamma Lombardis of Holbrook, Inc.*, 942 F.Supp.2d 274, 278–79 (E.D.N.Y. 2013); *Obester v. Lucas Assocs., Inc.*, 2009 WL 10665749, at *3–4 (N.D. Ga. June 5, 2009); *Williams v. Smith, White, Sharma & Halpern, P.A.*, 2009 WL 10669537, at *2–3 (N.D. Ga. May 20, 2009); *Munroe v. PartsBase, Inc.*, 2008 WL 4998777, at *3 (S.D. Fla. Nov, 20, 2008); *Torres v. Gristede's Operating Corp.*, 628 F.Supp.2d 447, 472–73 (S.D.N.Y. 2008); *Nesselrotte v. Allegheny Energy*, 2007 WL 3147038, at *11–12 (W.D. Pa. Oct. 25, 2007). As these cases discuss, counterclaims can support a retaliation claim when the counterclaims are "baseless," brought in bad faith, brought with a retaliatory motive and lack a reasonable basis in law and fact, or are "designed to deter claimants from seeking legal redress." because of their "in terrorem effect." *E.g.*, *Obester*, 2009 WL 10665749, at *3; *Munroe*, 2008 WL 4998777, at *2–3.

In considering the propriety of Plaintiff's proposed amendment under Rule 15, Defendant again urges the Court to apply the incorrect standard. Defendant contends that the Court could not possibly find that Defendant's counterclaim is baseless. In so arguing, Defendant cites to information outside of the pleadings. As discussed above, the Court considers futility under the Rule 12(b)(6) standard. Thus the Court is not tasked with deciding whether Defendant's counterclaim is baseless, and the Court does not look outside the relevant pleading. Instead, the Court considers whether Plaintiff plausibly has alleged that Defendant's counterclaim is baseless, brought with a retaliatory motive and lacks a reasonable basis in law and fact, or otherwise is designed to deter Plaintiff from seeking legal redress. *See, e.g.*, *Romero*, 2018 WL 1702001, at *6 (finding that allegations that the defendant's "sole purpose for filing [the] Counterclaim was to retaliate against Plaintiff Romero for filing this instant action" was sufficient to allege that the counterclaim was baseless and brought with a retaliatory motive and thus granting the motion to amend); *Desio*, 2016 WL 4721099, at *7–8 (summarizing the plaintiff's allegations that the defendant filed baseless counterclaims with retaliatory motive to discourage other dancers from asserting their rights under the FLSA and that the counterclaims threaten to take away dance fees dancers obtain from customers and threaten attorney's fees and costs, and concluding that: "Plaintiff's allegations sufficiently plead a *prima facie* case for a retaliatory claim under the FLSA. As such, the Court finds that Plaintiff's proposed amended complaint would survive a challenge of legal insufficiency under Federal Rule of Civil Procedure 12(b)(6), and is therefore not futile." (quotation marks omitted)); *Wilder*, 2015 WL 5244463, at *3 ("After considering the proposed amendment and the arguments of the parties, the Court cannot say at this stage of the proceedings that plaintiff is unable to prove any set of facts that would entitle him to relief on his proposed retaliation claim. Where the proposed amendment is plausible on its face and where there exist substantial arguments on whether or not plaintiff will ultimately prevail on the new claim, the amendment should be permitted. Whether or not plaintiff will ultimately prevail on his claims is not before the Court at this juncture and is better left for

13

resolution at a later stage of the proceedings." (citations omitted)); *Flores*, 942 F. Supp. 2d at 279 ("Plaintiffs claim of retaliation is based upon the allegation that Defendants' counterclaims are baseless and were filed in retaliation for the filing of the complaint . . . . The court does not rule as to whether the retaliation claim will succeed, but holds only that the allegations are sufficient to allow amendment of the complaint. Accordingly, the court grants Plaintiffs' motion to amend the complaint to set forth a claim for retaliation."); *Obester*, 2009 WL 10665749, at *3–4 (summarizing the plaintiff's relevant allegations, noting that the plaintiff "would have been better served to have specifically stated that Defendant's counterclaims are baseless" but nonetheless finding that the plaintiff's allegations provided the defendant with fair notice that the plaintiff is "alleging that the counterclaims are baseless or designed to deter [the plaintiff] from seeking legal redress for her claims of discrimination" and thus concluding that "given the expansive definition of retaliation under Burlington Northern, and the liberal standard applied to motions to amend under Fed. R. Civ. P. 15, the Court cannot say that Plaintiff's amendment is futile"); *Williams*, 2009 WL 10669537, at *2–3 (finding sufficient to withstand a futility challenge allegations that the defendant's counterclaims were "calculated to intimidate" the plaintiff and to "dissuade her from pursuing her claims," that the counterclaims "lack a reasonable basis in fact or law," and that the defendants' "retaliatory and improper motive is transparent").

The FLSA establishes that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3).

> Claims pursuant to § 215(a)(3) require that a plaintiff make a *prima facie* showing of "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010). Furthermore, "[a]n action taken by an employer is retaliatory if 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a[n] FLSA complaint." *McBurnie v. City of Prescott*, 511 F. App'x 624, 625 (9th Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 [126 S.Ct. 2405, 165 L.Ed.2d 345] (2006).

*Desio*, 2016 WL 4721099, at *7. Plaintiff meets the first prong because Plaintiff filed this pending action. The question is whether Plaintiff sufficiently alleges that Defendant's filing of its breach of contract counterclaim constitutes an adverse employment action, as that has been defined discussed above, and whether Plaintiff plausibly alleges the requisite causal connection.

14

337 F. Supp. 3d 962, 972–74 (D. Or. 2018). Defendants here similarly confuse the standard governing a 12(b)(6) motion (discussed above) with the standard governing a motion for summary judgment or at trial, making misguided factual arguments by relying on documentation outside the pleadings.

Fed. Rule Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Doe*, 219 F. Supp. 3d at 652-53; *Blanch*, 333 F. Supp. 3d at 791-92. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

In support of Defendants' Motion, Defendants cite to much evidence outside the scope of what is proper on a motion to dismiss.[12] For example, in Defendants' "Procedural and Factual Background" section, Defendants cite to several documents in the record that are not attached to the First Amended Complaint: a subpoena to LinkedIn (Doc. No. 23-1); an image of the " N word" (Doc. No. 19-2); an email from LinkedIn (Doc. No. 23-2); an additional email regarding the LinkedIn response to the subpoena (Doc. No. 23-3); and several emails between counsel in this case (Doc. Nos. 23-5; 23-6; 23-7; 23-9).[13]

In the argument section, Defendants again cite to two of these documents, (Doc. Nos. 23-2, 23-3), in addition to the Amended Answer to the Complaint (Doc. No. 31),[14] to support the proposition that:

> [t]he General's counterclaims are reasonably founded and not a 'sham.' They are supported by information from LinkedIn confirming that Plaintiff changed The General's LinkedIn trademark logo to a large image of the 'N word' and altered its content to include derogatory, racist statements regarding The General's employees and business practices. These facts create textbook causes of action under the Computer Fraud and Abuse Act and the Tennessee Personal and Commercial Computer Act.

---

[12] Responding to Defendants' Motion, Plaintiff also cites to much of the same evidence. For the same reasons discussed in connection with Defendants' arguments, the Court disregards Plaintiff's arguments based on evidence the Court cannot consider on a motion to dismiss.

[13] In their Reply, Defendants take issue with Plaintiff's attempt to rely on Docket No. 23-9 to show (in the alternative to her argument that she has met her *prima facie* case) that her claim is not baseless. Defendants argue that the email communication is "both irrelevant and inadmissible under Rule 408 of the Federal Rules of Evidence because it was made in furtherance of settlement discussions." (Doc. No. 47 at 4). The Court does not need to reach arguments regarding the admissibility of the evidence at this time, as the Court will not consider Docket No. 23-9 in reaching its decision. That is to say, because the Federal Rules of Civil Procedure preclude such consideration at this juncture, it is immaterial whether the Federal Rules of Evidence preclude their consideration. However, the Court notes that it is often (though not always) disingenuous for a party to cite a document when it benefits the party but then argue that it is inadmissible when the opposing party attempts also use it.

[14] As has been discussed, Defendants later filed a Second Amended Answer, which the Court has cited to throughout this opinion. In briefing, Defendants reference the First Amended Answer.

(Doc. No. 34 at 7-8 (internal citations omitted)). Then, in its Reply, Defendants attached an additional affidavit from a LinkedIn representative, which (according to Defendants) reflects that "LinkedIn has confirmed Plaintiff's conduct." (Doc. No. 47 at 1; Doc. No. 47-1). In a footnote, Defendants argue that "the Court can consider the Affidavit as it is central to the counterclaims and LinkedIn's investigation is referenced therein." (Doc. No. 47 at 1 n.1). For this proposition, Defendants cite *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001), which found that a district court should have considered a document referenced in and attached to the complaint when ruling on a motion to dismiss the complaint. But Defendants here have badly misrepresented the circumstances under which this Court can consider a document on a motion to dismiss a complaint (in whole or in part). For such consideration, it is not at all sufficient that the document "is central to" the defendant-movant's counterclaim(s).[15] In fact, the Court can consider only documents central to, *and* referred to in, *the complaint*.

In addition to the documents the Court cannot consider, Defendants cite to two emails (Doc. No. 23-4; 23-8) that are referenced in Plaintiff's First Amended Complaint and are central to the retaliation claims therein, as they contain the alleged threat and correspondence from

---

[15] The assertion that "LinkedIn's investigation" is referenced in the affidavit quite plainly is worthless to Defendants here because it has nothing to do with the applicable standard for consideration of the affidavit. Worse still, the Court is constrained to say that, to the undersigned's considerable chagrin, Defendants seemingly tried to pull a fast one on the undersigned by improperly equating the actual requirement (that the *document* was referred to in the *complaint*) with a strikingly inapplicable and non-sensical requirement (that the *subject matter of the document* is, as would always be the case, referred to in the *document*). Counsel are admonished, in no uncertain terms, to apply the *actual* standards at issue, rather than recharacterize them in an attempt to fool the Court into thinking the actual standard has been satisfied. Counsel have latitude to advocate creatively and zealously that a particular *real* standard is met. What counsel did here, however, was substantially out of bounds.

Defendants' counsel.[16] *See Bassett*, 528 F.3d at 430. The authenticity, validity, or enforceability of these emails does not seem to be in dispute by either party, as both parties rely on them at different points in briefing without raising any issue of their legal sufficiency. *See Mediacom Se. LLC*, 672 F.3d at 400; *Lewis Lumber & Milling, Inc.*, 2018 WL 6181356, at *2. But there is a problem even with these two emails; Defendants have referred to these emails by citing where they were attached to Defendants' response opposing Plaintiff's motion to amend her Complaint (Doc. No. 23), instead of attaching them to Defendants' Motion. However, the documents being attached to a different motion does not seem to preclude the Court from reviewing them. *See Mediacom Se. LLC*, 672 F.3d at 400 (noting that it would be appropriate to consider a document attached to a motion to intervene because it appears in the record if it is referred to in the complaint and central to the claims therein). Therefore, the Court finds that in ruling on Defendants' Motion, it can consider these two emails (but not the other documents relied on in Defendants' briefing as discussed in the preceding two paragraphs).

Therefore, the Court declines to consider any of the evidence cited to by Defendants, except for the two emails (Doc. Nos. 23-4; 23-8) that were central to and discussed in the First Amended Complaint. As a more general matter, it is improper on a Rule 12(b)(6) motion to dismiss to make arguments regarding what really happened or what is the truth, as opposed to taking all facts in the Plaintiff's First Amended Complaint as true. Here, Defendants stake much of their argument not only on the content of documents that the Court cannot consider at the current juncture, but also

---

[16] In the First Amended Complaint, Plaintiff references these two emails by date in paragraphs 34, 36, and 37, and she then builds her retaliation claim on the content contained therein. (Doc. No. 32 at 7).

upon their facts being "better than" or "correct" in comparison with Plaintiff's facts—an argument that is better suited for trial.

Additionally, in support of their argument that their counterclaims are not baseless or made in bad faith, Defendants rely on a previous Order of this Court, where the Magistrate Judge found that "[t]he Parties' mutual accusations of bad faith and dilatory motives are discussed in more detail below; the Court does not find bad faith on the part of either at this point." (Doc. No. 30 at 3). The Court is not persuaded that this quotation from the previous order evidences a lack of bad faith on the part of Defendants. The Court notes that it was clear that the Magistrate Judge confined his ruling to that specific juncture in the case, noting that he "d[id] not *find* bad faith on the part of [Defendants] *at this point*." The Magistrate Judge did not preclude the possibility of a later finding of bad faith, and he clearly left the merits of the case to the undersigned to determine. (*Id.* at 3, 6). At this stage, it is improper for the undersigned to resolve the merits of the underlying dispute of fact, and instead the Court just determines whether Plaintiff has plausibly alleged her claims.

In her response, Plaintiff argues that "[t]o properly plead her *prima facie* retaliation case, Ms. Viera simply has to allege that: (1) she engaged in protected activity; (2) she suffered adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." (Doc. No. 43 at 9). In so doing, she cites *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006), albeit without giving any indication of what *Adair* said or the context in which *Adair* said it.

As indicated below, the Court believes that Plaintiff here has correctly identified what—the three enumerated things mentioned above—a plaintiff must sufficiently allege to state a retaliation claim. On the other hand, Plaintiff incorrectly calls what needs to be pled a "*prima facie* case" and erroneously relies on *Adair* (which involved summary judgment and not a motion to dismiss for

19

failure to state a claim) for the pleading standard. And, for good measure, she misrepresents *Adair* by suggesting that it refers to the three things she says must be pled, when in fact it refers to four things. *See Adair*, 452 F.3d at 489 (holding that "[t]o establish a prima facie case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action.").[17] So the Court will detour to explain why, despite her missteps, Plaintiff correctly has identified what she needs to plead for a retaliation claim.

There are two different views of the requirements for a Title VII retaliation claim to survive a Rule 12(b)(6) motion to dismiss. One is reflected in cases like *Williams v. Michigan Dep't of Health & Human Servs.*, No. 19-13456, 2020 WL 4050246 (E.D. Mich. July 20, 2020), which states that a plaintiff

> must plead that (1) she engaged in a protected activity under Title VII, (2) the exercise of protected rights was known to the Defendants, (3) Defendants took adverse employment action against Williams, and (4) there was a causal connection between the adverse employment action and the protected activity. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995-96 (6th Cir. 2009).

*Id.* at *6. Cases like *Williams* appear to assume that the plaintiff must plead a *prima facie* case of retaliation. *Willliams* cites to *Hunter,* seemingly for the proposition that a plaintiff must plead the elements of a *prima facie* case as identified in *Hunter*. But actually *Hunter* does not stand for this proposition and indeed does not address or relate to pleadings requirements; *Hunter* dealt with a summary judgment motion, not a Rule 12(b)(6) motion to dismiss. 565 F.3d at 995-96 (6th Cir.

---

[17] The additional fourth requirement (that the plaintiff's exercise of her right was known by her employer) may not be a difficult one for the plaintiff to satisfy in many cases, including this one. But the fact remains that *Adair* stated it as a requirement (in the summary judgment context), contrary to Plaintiff's suggestion when citing *Adair*.

2009). And although *Hunter* did state the elements of *prima facie* case, it is not a safe assumption

that a plaintiff must *plead* (as opposed to *support with evidence at the summary judgment stage*)

all elements of a *prima facie* case. To the contrary, as explained above (perhaps to the point of

redundancy, alas), a plaintiff need not do so. As the Third Circuit has explained in reviewing a

district court's resolution of a motion to dismiss Title VII claims for, among other things,

retaliation:

> [The district court's] analysis proceeded with a point-by-point consideration of the
> elements of a *prima facie* case required under a pretext theory. It is thus worth
> reiterating that, at least for purposes of pleading sufficiency, a complaint need not
> establish a *prima facie* case in order to survive a motion to dismiss. A *prima facie*
> case is "an evidentiary standard, not a pleading requirement," *Swierkiewicz* [534
> U.S. at 510], and hence is "not a proper measure of whether a complaint fails to
> state a claim." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 213 (3d Cir.2009). As
> we have previously noted about pleading in a context such as this,
>
>> [a] determination whether a *prima facie* case has been made . . . is
>> an evidentiary inquiry—it defines the quantum of proof [a] plaintiff
>> must present to create a rebuttable presumption of discrimination.
>> Even post-*Twombly,* it has been noted that a plaintiff is not required
>> to establish the elements of a *prima facie* case. . . . *Id.* at 213 (citation
>> omitted). Instead of requiring a *prima facie* case, the post-*Twombly*
>> pleading standard " 'simply calls for enough facts to raise a
>> reasonable expectation that discovery will reveal evidence of' the
>> necessary element[s]." *Phillips v. Cty. of Allegheny,* 515 F.3d 224,
>> 234 (3d Cir.2008) (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct.
>> 1955).
>
> . . . [A]t this early stage of the proceedings, it is enough for Connelly to
> allege sufficient facts to raise a reasonable expectation that discovery will uncover
> proof of her claims.
>  For [these] reasons, Connelly's retaliation claim may survive Lane's
> motion to dismiss if she pleads sufficient factual allegations to raise a reasonable
> expectation that discovery will reveal evidence of the following elements: (1) she
> engaged in conduct protected by Title VII; (2) the employer took adverse action
> against her; and (3) a causal link exists between her protected conduct and the
> employer's adverse action. *Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 201 (3d
> Cir.1994).

*Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016). As the Court discussed at

length above, Plaintiff is not required to make out her *prima facie* case at the motion to dismiss

stage; instead, she is just required to show the plausibility standard. The Third Circuit's view—that "it is enough for [the plaintiff] to allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims" under Title VII—[18]mirrors that of the Sixth Circuit noted above.

So to be clear, a plaintiff need not specifically allege each of the four Sixth Circuit elements of a claim of retaliation. And it need not even specifically allege each of the three things specified both by Plaintiff here and the Third Circuit in *Connelly*. Instead, a plaintiff need only allege *sufficient facts to raise a reasonable expectation that discovery will uncover proof of* these three things.

With respect to the second of these three things (that the employer took an adverse employment action against the plaintiff),[19] a plaintiff must allege sufficient facts to raise a

_____

[18] In *Connelly*, the Third Circuit went on to suggest that a plaintiff must raise a reasonable expectation that discovery will reveal something a little more specific, *i.e.*, evidence of the elements of a *prima facie* case (and not merely evidence of her claims generally). Any such suggestion appears to diverge from the Sixth Circuit's view. In *Keys*, the Sixth Circuit noted that at the pleading stage it is not clear what (if any) *prima facie* case under *McDonnell Douglas* the plaintiff may ultimately have to prove. Thus, it is hard to see why the Sixth Circuit would require allegations plausibly suggesting that a *prima facie* case in particular could ultimately be established.

Herein, the Court has held Plaintiff to a standard lower than that suggested by the Third Circuit, not requiring plaintiff to plead facts indicating that a *prima facie* case could be established and (as noted above repeatedly for emphasis) certainly not requiring Plaintiff to plead a *prima facie* case. Rather, the Court has been looking for factual (as opposed to conclusory) allegations suggesting merely in general terms the existence of the alleged unlawful retaliation claim based on Defendants' counterclaims.

As an aside, the Court notes that the Third Circuit's set of elements for a *prima facie* case of retaliation appears to differ from the Sixth Circuit's. That is, the elements stated in *Connelly* with a citation to *Charlton* (which unquestionably was referring to the elements of a *prima facie* case of retaliation) omit an element recognized by the Sixth Circuit, *i.e.*, that the exercise of protected rights was known to the defendant.

[19] The Court notes that the alleged conduct occurred after the end of Plaintiff's employment relationship with Defendants. Neither party seems to dispute that filing a counterclaim, even by an

*ex-employee*, can qualify as an adverse "employment" action. The Court in *Gill* analyzed in depth whether such conduct can qualify as an adverse employment action in the Sixth Circuit:

> Defendants argue that it is well-established in the Sixth Circuit that in order to satisfy the adverse action requirement, plaintiff must show a "materially adverse employment action." *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir.1996) . . .

> Plaintiff does not dispute this authority, but argues that a counterclaim can constitute adverse action for purposes of a retaliation claim, relying on *EEOC v. Outback Steakhouse of Florida, Inc.*, 75 F.Supp.2d 756 (N.D. Ohio 1999). In that case, the court held that the anti-retaliation provision of Title VII is not limited simply to discrimination affecting employment terms but may include other forms of discrimination that are allegedly adverse to the employee or former employee. The EEOC commenced its lawsuit against defendant Outback Steakhouse alleging that a counterclaim Outback had filed against its former employee in a separate, earlier action for sexual harassment commenced by the employee, constituted retaliation under Title VII. Outback moved to dismiss the claim by the EEOC on the basis that its earlier counterclaim against the former employee had no affect [sic] on her employment status and could not be actionable under Title VII. The district court disagreed.

> The court's analysis started with the anti-retaliation statute itself, which provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3. The first step in any interpretation of a statute is to determine whether the language at issue has a "plain and unambiguous meaning, with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S. Ct. 843, 136 L.Ed.2d 808 (1997). The inquiry must cease if the language is unambiguous and the statutory scheme is "coherent and consistent." *Id.*, quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S. Ct. 1026, 103 L.Ed.2d 290 (1989). The court recognized that the term "employee" includes "former employee." *Outback Steakhouse of Florida, Inc.*, 75 F.Supp.2d at 757–58, citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S. Ct. 843, 136 L.Ed.2d 808 (1997). The court went on to conclude that the kind of discrimination prohibited cannot be limited simply to a change in employment status.

> > The reasoning for this is simple: nothing in the plain language of the statute admits of such a qualification, and there is nothing in the statute which the court finds ambiguous. Title VII states that employers cannot discriminate against employees in retaliation for employees' participation in claims brought under the statute. In the case at hand, the complaint alleges that Outback

discriminated against [plaintiff] in filing a counterclaim against her,
and that Outback had a retaliatory motive in doing so. "If the
statutory language is unambiguous, in the absence of a 'clearly
expressed legislative intent to the contrary, that language must be
regarded as conclusive." *Russello v. United States*, 464 U.S. 16, 20,
104 S. Ct. 296, 78 L.Ed.2d 17 (1983) (citations omitted). The
EEOC's complaint states a claim under the unambiguous language
of 42 U.S.C. § 2000e–3.

*Id.* at 758.

Furthermore, the court reasoned that, although the substantive provisions of
Title VII clearly limited actionable discrimination to claims that are related to
employment, the anti-retaliation provision "contains no such qualifiers, prohibiting
only discrimination that takes place because an employee has 'made a charge,
testified, assisted, or participated' in actions under Title VII. The inclusion of
qualifying language in Title VII's substantive provision, and its exclusion in the
anti-retaliation provision, implies that a retaliatory act need not be employment-
related in order to be actionable under Title VII." *Id.*

The court further reasoned that this result is not inconsistent with the
holding in *Kocsis*, which did "not pass on whether the retaliatory act needs to be
employment related under Title VII. Rather . . . [it only goes] to whether the alleged
retaliatory act was sufficiently adverse." *Id.* at 759. The impetus behind Title VII's
anti-retaliation provision is the need to prevent employers from deterring victims
of discrimination from complaining to the EEOC. *Robinson v. Shell Oil*, 519 U.S.
at 346). It is certainly true that "a lawsuit . . . may be used by an employer as a
powerful instrument of coercion or retaliation" and that such suits can create a
"chilling effect" on the pursuit of discrimination claims. *Bill Johnson's
Restaurants, Inc. v. NLRB*, 461 U.S. 731, 740–41, 103 S.Ct. 2161, 76 L.Ed.2d 277
(1983).

While the Sixth Circuit has not addressed this precise issue, the majority of
courts, including the Supreme Court, have been willing to construe Title VII and
companion provisions under the Fair Labor Standards Act and the ADEA broadly
in order not to frustrate the purpose of these Acts, which is to prevent fear of
economic retaliation from inducing employees "quietly to accept [unlawful]
conditions." *See Mitchell v. Robert DeMarco Jewelry, Inc.*, 361 U.S. 288, 292, 80
S. Ct. 332, 4 L.Ed.2d 323 (1960); *EEOC v. Ohio Edison Company*, 7 F.3d 541,
544–45 (6th Cir.1993). This court is persuaded by the foregoing analysis and, like
the court in *Outback Steakhouse*, concludes that the anti-retaliation provisions of
the ADA, ADEA, and the THRA cannot be exclusively limited to adverse actions
that are changes in the employment relationship.

24

reasonable expectation that the proof will show that the defendant's counterclaims were "baseless, brought with a retaliatory motive and lacks a reasonable basis in law and fact, or otherwise is designed to deter Plaintiff from seeking legal redress."[20] *Robillard*, 337 F. Supp. 3d at 973; *Carr v. TransCanada USA Servs., Inc.*, No. 3:14-CV-01084, 2014 WL 6977651, at *2 (M.D. Tenn. Dec. 8, 2014) (dismissing retaliation claim when plaintiff made no allegation of "bad faith" or "retaliatory motive").

---

This ruling is in accord with decisions from a number of other courts which have also found that "the filing of lawsuits, not in good faith and instead motivated by retaliation, can be the basis for a claim under Title VII." *Harmar v. United Airlines, Inc.*, 1996 WL 199734 (N.D. Ill.) . . .

As stated above, this court concludes that the adverse action requirement for a retaliation claim encompasses an allegedly bad faith counterclaim brought by the employer against its former employee.

*Gill v. Rinker Materials Corp.*, No. 3:02-CV-13, 2003 WL 749911, at *3-5 (E.D. Tenn. Feb. 24, 2003); *see also Robillard*, 337 F. Supp. 3d 962, 972–74 (D. Or. 2018); *Green v. Sparta Veterinary Servs., LLC*, No. 2:16-00012, 2016 WL 10720466, at *3 (M.D. Tenn. Aug. 24, 2016) ("[A] former employee can be subject to an adverse action. This includes the filing of a counterclaim in response to a discrimination complaint, particularly where the counterclaim is permissive and is not brought in good faith or with an ulterior motive."). The year after *Gill*, though not resolving the issue, the Sixth Circuit cited *Outback Steakhouse* with approval. *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 799 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

The Court realizes that filing a counterclaim against an ex-employee may not seem like an adverse "employment" action, but in any event it is an adverse action by the (ex-)employer sufficient to support a Title VII claim. Therefore, though it occurred after Plaintiff's employment relationship with Defendants, the Court finds that Plaintiff has sufficiently alleged that she was subject to an adverse employment action.

[20] Plaintiff argues that she is not required to allege that Defendants' counterclaims are "baseless" and instead is required to allege only her *prima facie* case. (Doc. No. 43). Plaintiff is wrong in that she actually does not have to plead her *prima facie* case. She is correct that she does not have to specifically allege that the counterclaims are "baseless," she does have to allege facts suggesting that she ultimately could prove that they were baseless, brought with a retaliatory motive and lacking a reasonable basis in law and fact, or otherwise is designed to deter Plaintiff from seeking legal redress.

25

Here, Plaintiff has plausibly alleged facts that allow her to survive a motion to dismiss on her retaliation claim, as she has alleged facts that show that there is a reasonable expectation that discovery will provide proof of her claims. Plaintiff has alleged facts suggesting that she could ultimately prove that 1) she engaged in conduct protected by Title VII (filing a Complaint), 2) there was an adverse employment action (the filing of the counterclaim), and 3) a causal link between her protected conduct and the adverse action (as indicated by the content of the communications between counsel). As *Connelly* suggests, this is sufficient.

Regarding the second of these, Plaintiff has plausibly alleged facts suggesting that she could develop (via discovery) proof that the counterclaims were "baseless, brought with a retaliatory motive and lacks a reasonable basis in law and fact, or otherwise is designed to deter Plaintiff from seeking legal redress." She did so by alleging that Defendants threatened counterclaims under a criminal statute lacking any civil remedial provisions.[21] (Doc. No. 32 at 7-8); *Robillard*, 337 F. Supp. 3d at 973. Though Defendants (wisely) ultimately did not bring claims under the Tennessee criminal impersonation statute, Defendants' counsel's references to the criminal statute in the emails are enough to plausibly allege that Defendants acted with a retaliatory motive or to deter Plaintiff from seeking legal redress via further litigating her claims, and that further evidence of this may be found during discovery.[22]

---

[21] Tenn. Code Ann. § 39-16-301(a) is a criminal statute aimed at incriminating impersonation with intent to defraud. The criminal statute contains no avenue for civil remedies and is solely criminal in nature and effect.

[22] The Court adds that it is very familiar with the line between threatening to pursue a civil remedy and threatening to pursue criminal investigation and/or prosecution, and the Court at present cannot say that counsel for Defendants went over that line, especially since counsel may simply have mistakenly (but honestly) believed that Tenn. Code Ann. § 39-16-301(a) provides a civil remedy. That is not to say, however, that counsel would have been much better served to have put that belief to the test before saying something to Plaintiff's counsel based on that belief.

Therefore, the Court finds that Plaintiff has plausibly alleged her claims for retaliation in her First Amended Complaint, and the Court rejects Defendants' argument to the contrary.

2. Whether Defendants' counterclaim was compulsory

Tacking a different tack, Defendants argue that the claims they brought as counterclaims were compulsory, and that because they were (supposedly) compelled to bring the counterclaims or lose them, the counterclaims therefore cannot constitute a retaliatory adverse action. (Doc. No. 34 at 8).

Fed. R. Civ. P. 13(a) provides the rule for compulsory counterclaims:

> A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

In turn, Fed. R. Civ. P. 13(b) provides the rule for permissive counterclaims, stating that "[a] pleading may state as a counterclaim against an opposing party any claim that is not compulsory." The test in the Sixth Circuit for determining whether a claim is compulsory or permissive has been stated as asking whether:

> the two claims "arise" out of the same transaction or occurrence. Rather than look to whether the original claim and counterclaim literally arise out of the same transaction or occurrence, we ask, "Is there a logical relationship between the two claims?" *See Maddox v. Ky. Fin. Co.*, 736 F.2d 380, 382 (6th Cir. 1984). "Under this test, we determine whether the issues of law and fact raised by the claims are largely the same and whether substantially the same evidence would support or refute both claims." *Sanders*, 936 F.2d at 277 (citing *Moore v. New York Cotton Exch.*, 270 U.S. 593, 46 S. Ct. 367, 70 L. Ed. 750 (1926)) (emphasis added). A partial overlap in issues of law and fact does not compel a finding that two claims are logically related. *See Peterson v. United Accounts, Inc.*, 638 F.2d 1134, 1137 (8th Cir.1981).

*Bauman v. Bank of Am., N.A.*, 808 F.3d 1097, 1101 (6th Cir. 2015); *see also Quinn v. Griffith*, 515 F. App'x 543, 548 (6th Cir. 2013) (deeming a counterclaim not a compulsory counterclaim to the

original claim, because "[t]he issues of law and fact raised by the claims are not largely the same and the same evidence would not support or refute both claims.").

Facing similar circumstances where defendants attempted to argue that counterclaims were compulsory and sought to dismiss plaintiffs' retaliation claims based on the filing of the counterclaims, two other courts in this circuit found claims to be permissive and dismissed the defendants' arguments as unconvincing. In one, the court noted:

> Defendants also assert that the retaliation claim should be dismissed, in part, because their counterclaim was a compulsory counterclaim under Rule 13(a), Federal Rules of Civil Procedure. Defendants could have brought their counterclaims as independent claims at any time. Clearly they did not accrue when plaintiff filed his discrimination complaint, but they would have accrued at the time he committed the actions defendants assert. I find defendants' argument without merit.

*Gill v. Rinker Materials Corp.*, No. 3:02-CV-13, 2003 WL 749911, at *6 (E.D. Tenn. Feb. 24, 2003). And in the other, the court explained:

> Specifically, Defendants allege that 'subsequent to plaintiff's termination and without either defendant's permission, on numerous and various occasions during February and March 2016, plaintiff accessed' [Defendants' social media and email accounts] via her 'knowledge of private passwords.' . . . [T]he law surrounding computer hacking is entirely different from a wage claim. As such, Defendants' Counterclaims are permissive.

*Green v. Sparta Veterinary Servs.*, LLC, No. 2:16-00012, 2016 WL 10720466, at *2 (M.D. Tenn. Aug. 24, 2016). The Court finds these cases persuasive.

Therefore, the Court finds that Defendants' counterclaims are permissive counterclaims, not compulsory counterclaims. Defendants could have brought their claims in a separate action at any point, instead of filing a counterclaim.[23] There is also no overlap of law or operative (as

---

[23] On February 13, 2020, Defendants' counsel emailed Plaintiff's counsel and stated that Defendants were considering filing counterclaims against Plaintiff, including for criminal impersonation, due to information they had received from LinkedIn regarding conduct Plaintiff committed after her termination. (Doc. No. 32 at 7; Doc. No. 23-4). Defendants' counsel stated

28

opposed to mere background) fact: the (alleged) conduct of Plaintiff occurred after the conduct Plaintiff alleged in her original Complaint, and allegations regarding computer hacking are separate (both factually and legally) from allegations of discrimination.[24] *Gill*, 2003 WL 749911, at *6; *Green*, 2016 WL 10720466, at *2.

Additionally, the Court notes that, again, Defendants are attempting to make arguments that should instead be made at the summary judgment stage or at trial.[25] The Court has already

---

that they were willing to sign mutual releases if Plaintiff was willing to drop the lawsuit. (Doc. No. 32 at 7; Doc. No. 23-8). Plaintiff believes this to have been a threat, and that the threat to file counterclaims was a retaliatory response. (Doc. No. 32 at 7). Defendants then filed a Motion for Leave to Amend Answer to Add Counterclaims on March 6, 2020. (Doc. No. 19). The same day, Plaintiff filed a Motion to Amend. (Doc. No. 20). Both Motions were granted by the Magistrate Judge. (Doc. No. 30). After the Magistrate Judge's order, both Defendants and Plaintiff filed their amended documents on April 30, 2020. (Doc. Nos. 30, 31).

An argument theoretically could be made that if Plaintiff filed her First Amended Complaint first, then Defendants' counterclaims would be compulsory as they would arise out of the same transaction or occurrence alleged in Plaintiff's First Amended Complaint. However, that scenario would be impossible in the present case; the sequencing would simply make no sense. Plaintiff amended her complaint to specifically allege that the counterclaims were retaliatory, and there would have been no reason to amend her complaint to make these allegations unless counterclaims previously had been filed by Defendants.

[24] In their Reply, Defendants again rely to no avail on a comment the Magistrate Judge made in his Order. Defendants state that "The General could not have asserted its counterclaims in its November 5, 2019, answer." (Doc. No. 47 at 7). For this statement, Defendants rely on the Magistrate Judge's statement that "[t]he General timely filed its Motion [for Leave to Amend Answer to Add Counterclaims and Supporting Memorandum of Law, (Doc. No. 19)] before the deadline for such motions and just over a month after receiving the documents and information that underlie the proposed counterclaims." (Doc. No. 30 at 3). However, contrary to Defendants' implication, the mere fact that a motion is *timely* does not mean that it was the *only time* the motion could be made.

[25] In her Response to Defendants' Motion, Plaintiff makes a factual *faux pas* of a different kind. Plaintiff indicates that in October 2019 (before Plaintiff had filed the present action) Defendants' counsel informed Plaintiff's counsel that Defendants believed Plaintiff made an unauthorized change to its LinkedIn page after her termination. (Doc. No. 43 at 2). Unlike Defendants who cite to documents the Court cannot consider, Plaintiff provides the Court with no citation for these facts and does not recite the facts in her First Amended Complaint. The Court will therefore disregard them in ruling on these Motions.

29

noted what documents it can properly consider on a motion to dismiss, and Defendants again cite to documents the Court cannot consider. For example, in making its argument that its counterclaim was compulsory, Defendants again cite to the Amended Answer, (Doc. No. 31), making the entirely factual argument that "LinkedIn produced documents and information proving that Plaintiff, on her last day of employment, changed The General's LinkedIn trademark logo to a large image of the 'N word' and altered its content to include derogatory statements regarding The General's employees and business practices, asserting racism and discriminatory practices." (Doc. No. 34 at 9). On a motion to dismiss, the Court will not reference documents outside of those identified herein as appropriate, and the Court will not engage in an analysis of what facts are "true" and "not true," as Defendants invite the Court to do.

For these reasons, the Court finds Defendants' second argument in their Motion unconvincing, and the Court will not grant Defendants' Motion. As a result, Plaintiff's retaliation claims survive Defendants' Motion (which challenges those claims only in part, as noted above) in their entirety.

### B. Plaintiff's Motion

In her Motion, Plaintiff has moved to dismiss Defendants' counterclaims. Plaintiff argues that under both the CFAA and the TPCCA, Defendants have not adequately pled 1) that Plaintiff acted "without authorization," and 2) that Defendants suffered appropriate and recoverable damages. (Doc. No. 42). Defendants respond that they have appropriately pled that Plaintiff acted "without authorization" and appropriately pled damages and loss, and so their counterclaims should not be dismissed. (Doc. No. 46).

### 1. CFAA

#### a. Without Authorization

30

Plaintiff argues that she was authorized to access Defendants' LinkedIn page[26] as an employee, and so she could not have acted "without authorization." (Doc. No. 42 at 7). Defendants respond that Plaintiff has misread the case law in this area, and that since Plaintiff had been terminated (and therefore was a *former* employee) at the time of access in question, Plaintiff acted "without authorization." (Doc. No. 46 at 4-6).

> The CFAA states that whoever:
>
> (A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
>
> (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
>
> (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss . . .
>
> shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(5). Defendants do not specify the subparagraph of paragraph 1030(a)(5) under which they are bringing their claim. The CFAA, though "primarily a criminal statute," also prescribes civil remedies. *RN Entm't, LLC v. Clement*, 380 F. Supp. 3d 711, 717 (M.D. Tenn. 2019). Among its subparagraphs (A)-(C), paragraph 1030(a)(5) of the CFAA describes two types of claims of alleged wrongdoing: "access" claims and "transmission" claims. Such claims require that Plaintiff's access or transmission, respectively, of Defendants' data be without authorization. *ReMedPar, Inc. v. AllParts Med., LLC*, 683 F. Supp. 2d 605, 609 (M.D. Tenn. 2010) ("Thus, for

---

[26] The Court notes that the parties use various terms, such as webpage, account, and profile, to reference the LinkedIn interest at issue. When the parties reference a "page" or "webpage," they seem to be more specifically referencing Defendants' "profile" on LinkedIn. The Court would consider a "profile" on LinkedIn to be one aspect of having an "account" on LinkedIn. Therefore, though various terms are used by the parties through briefing, the Court herein speaks specifically of Defendants' interest in its LinkedIn "account," one aspect of which is a "profile."

all civil claims under the CFAA, a plaintiff must show that the defendant's access to the protected computer was either 'without authorization' or that it 'exceed[ed] authorized access.' " (citation omitted)). Plaintiff contends that Defendants' CFAA claim fails because (according to Plaintiff) Defendants have not pled in their counterclaims that Plaintiff accessed a computer without authorization. (Doc. No. 42 at 6). Plaintiff spends much time in her memorandum in support of her Motion discussing a circuit split regarding the CFAA and arguing that under the statute as properly construed, her alleged conduct was not "without authorization." (*Id.* at 6-8).

The undersigned has previously discussed the circuit split regarding the CFAA and what "without authorization" means:

> Plaintiff correctly argues that the CFAA does not expressly define the term "without authorization" and some courts have "found that an employee may access an employer's computer 'without authorization' where it utilizes the computer to access confidential or proprietary information that he has permission to access, but then uses that information in a manner that is inconsistent with the employer's interest." (Doc. No. 23 at 6 (citing *Frees, Inc. v. McMillan*, No. 3:06-cv-307, 2007 WL 708593, at *2 (E.D. Tenn. Mar. 5, 2007) and *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000))).

> The Sixth Circuit has not addressed whether an employee's misuse or misappropriation of an employer's computer-accessible business information is "without authorization" when an employer has given the employee permission to access such information. But other district courts in this circuit have adopted a narrow approach, holding that there is no violation of the CFAA if an employer has given an employee access to a computer and the employee subsequently misuses data or confidential information obtained on the computer. *See Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, No. 18-10986, 2019 WL 1112387, at *3 (E.D. Mich. Mar. 11, 2019); *see also ReMedPar, Inc.*, 683 F. Supp. 2d at 610 (no CFAA violation when defendant "had access . . . for the purpose of performing his job while he was still an employee, and for performing the tasks he undertook as an independent contractor[.]"); *Black & Decker (US), Inc. v. Smith*, 568 F. Supp. 2d 929, 935-36 (W.D. Tenn. 2008); *Am. Family Mut. Ins. Co. v. Rickman*, 554 F. Supp. 2d 766, 771 (N.D. Ohio 2008) ("The [CFAA] was not meant to cover the disloyal employee who walks off with confidential information. Rather, the statutory purpose is to punish trespassers and hackers[.]").

> Although there is a split of authority on this issue, the weight of authority appears to be that there cannot be a CFAA violation where an employee has lawful

32

access to his computer. *See Scheper v. Daniels*, No. 1:10-CV-385, 2011 WL 13228113, at *2 (S.D. Ohio June 1, 2011) (collecting cases). In *Scheper*, referring to courts that have adopted this narrow approach, the court explained:

> Generally speaking, these courts have reasoned that the according to its plain terms, the CFAA's reference to "without authorization" and "exceeds authorized access" means that the defendant did not have permission to access the information within the computer from the outset, *i.e.*, the defendant was a hacker, and that the statute was not meant to cover employees who have authorized access to the data but later misappropriate it.

*Id.*

"Additionally, the majority of district courts in the Sixth Circuit to address this issue have adopted the narrow approach." *Kraft*, 2019 WL 1112387, at *3 (collecting cases). The Court agrees with the majority of district courts within the Sixth Circuit, and also adopts the narrow interpretation of the CFAA. In addition to the weight of persuasive authority in this circuit, the Court finds three points convincing.

First, as discussed above, the plain language of the statute supports this narrow interpretation. In *Black & Decker*, the Court explained:

> [T]he statute defines the term "exceeds authorized access" as "access[ing] a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." § 1030(e)(6) . . . . [T]he plain meaning of "exceeds authorized access" is "to go beyond the access permitted." Likewise, while there is no definition for access "without authorization," the Court finds that its plain meaning is "no access authorization."

568 F. Supp. 2d at 934-35 (internal quotation marks and citations omitted). The Court concurs with this analysis.

Second, although the Court recognizes the limitations on its probativeness and persuasiveness, the CFAA's legislative history supports a narrow interpretation of the CFAA. The general purpose of the CFAA "was to create a cause of action against computer hackers (*e.g.*, electronic trespassers)[,]" *Int'l Ass'n of Machinists and Aerospace Workers v. Werner–Masuda*, 390 F. Supp. 2d 479, 495-96 (D. Md. 2005) (citation omitted), as well as to protect computer owners against trespass. *Black & Decker*, 568 F. Supp. 2d at 935-36. In 1986, "Congress amended the CFAA to substitute the phrase 'exceeds authorized access' for the phrase 'or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend.' " *Werner-Masuda*, 390

33

F. Supp. 2d at 499 n. 12 (quoting S. Rep. No. 99–432, at 9 (1986)). The intent of enacting this amendment was to "eliminate coverage for authorized access that aims at purposes to which such authorization does not extend, thereby remov[ing] from the sweep of the statute one of the murkier grounds of liability, under which a [person's] access to computerized data might be legitimate in some circumstances, but criminal in other (not clearly distinguishable) circumstances that might be held to exceed his authorization." *Id.*

Finally, because the CFAA is a criminal statute, the rule of lenity counsels the Court to construe the CFAA's coverage narrowly. *See Black & Decker*, 568 F. Supp. 2d at 935 (explaining that the CFAA is a criminal statute, and "even though it is being applied in a civil context, the [c]ourt must apply the rule of lenity, so that the statute is interpreted consistently"). After all, conduct supports a civil claim under the CFAA only if it falls within the statute's criminal prohibitions. And since the rule of lenity limits the conduct that falls within the criminal prohibitions, it likewise limits the conduct that will support a civil claim. Under the rule of lenity, "ambiguities are generally resolved in favor of the party accused of violating the law," *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 420 n. 3 (6th Cir. 2006). The narrow interpretation of the CFAA resolves any ambiguities accordingly.

*Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 836-39 (M.D. Tenn. 2019) (Richardson, J.). Though Plaintiff places much weight on this circuit split and how the Court should come down on it, the circuit split is irrelevant where, as here, the party acted *after termination*, as opposed to *during their employment*. *See United States v. Steele*, 595 F. App'x 208, 211 (4th Cir. 2014) ("Importantly, this split focuses on employees who are authorized to access their employer's computers but use the information they retrieve for an improper purpose. [Defendant's] case is distinguishable for one obvious reason: he was not an employee of SRA at the time the indictment alleges he improperly accessed the company's server."). To this end, courts have held that access contemplated by 18 U.S.C. § 1030(a)(5) by a former employee is "without authorization." *E.g.*, *Steele*, 595 F. App'x at 211 ("[T]he fact that [Defendant] no longer worked for [the company] when he accessed its server logically suggests that the authorization he enjoyed during his employment no longer existed."); *RN Entm't, LLC*, 380 F. Supp. 3d at 719 ("[T]o the extent that [Plaintiff] alleges that [Defendants] withheld passwords, deleted emails, and otherwise

34

impaired [Plaintiff's] access to its website and email servers after their termination, those allegations do state a claim under the CFAA."); *Rickett v. Smith*, No. 1:14-CV-70-GNS-HBB, 2015 WL 3580500, at *7 (W.D. Ky. June 5, 2015) ("Terminating an employee is a clear indication of rescinded authorization.").

The idea seems to be that when an employee is terminated, his or her authorization to access the employer's computer systems, accounts, etc., is implicitly terminated even if not explicitly terminated. As a matter of common sense, this strikes the undersigned as a very sound implication as a general matter. So it is easily inferable here that when Plaintiff accessed Defendants' LinkedIn account after (even though not much after) her termination, her authorization had already been terminated.by virtue of her prior termination. That is not to say that Plaintiff could not possibly somehow make a showing that in *her particular* case, contrary to the usual situation, she somehow retained authorization at least to the point of her alleged access. But for purposes of Plaintiff's Motion, what matters is whether Defendant has plausibly alleged, consistent with the usual implication, that her termination of employment (at least implicitly) effected a termination of her authorization.

The Counterclaim expressly states that that: "[a]fter The General terminated Ms. Viera's employment, Ms. Viera intentionally accessed The General's LinkedIn webpage *without authorization*, using credentials that at the time (*post-termination*) she was *not permitted* to use." (Doc. No 39 at 9 (emphasis added)). Therefore, the Court finds that Defendants have sufficiently pled that Plaintiff's access of the LinkedIn account was "without authorization."

The undersigned would be remiss if it did not comment, in a way that frankly does not reflect ideally upon himself, upon Plaintiff's reliance upon the rule of lenity. As discussed above,

35

within the last two years (in *Wachter*)[27] the undersigned relied on the rule of lenity to support a narrow construction of the term "without authorization" for purposes of the CFAA; in so doing, the court cited case law to support the view that the rule of lenity applies to the interpretation of a criminal statute even where it is being construed in the context of a civil case. Here, Plaintiff has done likewise, (Doc. No. 42 at 5), quoting the civil case of *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-CV-450, 2012 U.S. Dist. LEXIS 90064 (W.D. Mich. June 29, 2012), for the proposition that "because the CFAA is primarily a criminal statute, the rule of lenity requires any ambiguity to be resolved in favor of the party accused of violating the law." *Id.* at *4. Alas, while hardly adopting an tenable position and perhaps even being prescient, both the undersigned previously and Plaintiff here have failed to account for current Sixth Circuit law on this issue. In *Esquivel-Quintana v. Lynch*, 810 F.3d 1019 (6th Cir. 2016), *rev'd on other grounds sub nom. Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017), the court stated that "[a]n increasingly emergent view asserts that the rule of lenity ought to apply in civil cases involving statutes that have both civil and criminal applications." *Id.* at 1023. And the court granted that "[t]here are compelling reasons to apply the rule of lenity in such cases." *Id.* However, the court explained that:

> Nonetheless, while this view is increasing in prominence, the Supreme Court has not made it the law. To the contrary, the Court has reached the opposite conclusion. In *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, the Court deferred to the Secretary of the Interior's definition of the term "take" in the Endangered Species Act of 1973, even though violations of the act could be enforced by criminal penalties. 515 U.S. 687, 703–04, 115 S. Ct. 2407, 132 L.Ed.2d 597 (1995). The Court expressly considered and rejected the rule of lenity: "We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement." *Id.* at 704 n. 18, 115 S. Ct. 2407.

---

[27] Nothing herein is meant to suggest that the Court would have decided *Wachter* differently had it not applied the rule of lenity therein.

36

*Id.* at 1024. Thus, despite noting that the "[Supreme] Court has begun to distance itself from *Babbitt*" in dicta, *id.*, the Sixth Circuit went on to note that it did not perceive either that *Babbitt* had been overruled or that the rule of lenity should apply to the civil proceeding at bar. *Id.* And "[a]s an 'inferior' court, our job is to adhere faithfully to the Supreme Court's precedents," which in *Esquivel-Quintana* meant not applying the rule of lenity (and instead applying so-called *Chevron* deference as the governing principle of statutory interpretation). *Id.* Ultimately, the Sixth Circuit opinion in *Esquivel-Quintana* stands (if only just barely) for the proposition that the rule of lenity should not apply in civil (or administrative) contexts.

Of course, just as the Sixth Circuit must follow Supreme Court precedent, the undersigned must follow Sixth Circuit and Supreme Court precedent. The Court does not see where the relevant principle of *Esquivel-Quintana* (which was not the basis for *Esquivel-Quintana*'s reversal by the Supreme Court and thus remains binding precedent for this Court) has been since been rejected by the Sixth Circuit or the Supreme Court. So this Court follows it and rejects application of the rule of lenity on the grounds that it is inapplicable in this civil context.

Alternatively, the Court notes that it does not find that whether a terminated employee acts without authorization to be ambiguous under the CFAA, a prerequisite to the applicability of the rule of lenity here. Moreover, Plaintiff does not provide the Court with fulsome briefing—as opposed to curt and conclusion assertions—as to why the rule of lenity should apply. The Court therefore would decline to apply the rule of lenity in this case even if its application were not otherwise precluded by *Esquivel-Quintana*.

      b.  <u>Loss or damage</u>

Plaintiff argues that Defendants have not adequately pled a "loss" and "damage"[28] under the CFAA. (Doc. No. 42 at 8-10). Defendants respond that they have plausibly alleged both "loss" and "damage." (Doc. No. 46 at 7-8).

The statute defines "loss" as:

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service

18 U.S.C. § 1030(e)(11). The Sixth Circuit has previously interpreted the meaning of "loss" under the CFAA, explaining that:

---

[28] There is confusion in the parties' briefing regarding whether Defendants are required to plead both "loss" and "damage" or just "loss" or just "damage." It is true, as Defendants note, that 18 U.S.C. § 1030(g) states that: "[a]ny person who suffers damage *or* loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." (emphasis added). So the civil remedy sought by Defendants requires either damage *or* loss resulting from a violation. But that is not to say that Defendants can prove the underlying violation itself by showing either damage *or* loss; conceivably, the underlying violation could require a showing of damage (with loss not being an option), a showing of loss (with damage not being an option), or a showing of both damage *and* loss. The specific provision that Defendants allege Plaintiff violated, 18 U.S.C. § 1030(a)(5), states:

> (A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes *damage* without authorization, to a protected computer;
>
> (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes *damage*; or
>
> (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes *damage and loss.*

18 U.S.C. §1030(a)(5) (emphasis added). Though Defendants do not specify the subparagraph of paragraph 1030(a)(5) under which they are bringing their claim, none of these subsections (A, B. or C) require "damage *or* loss" (as subsection (g) does); instead, each requires either "damage [only]" or "damage *and* loss." As the Court finds that Defendants have plausibly alleged both damage and loss, the Court will discuss both concepts irrespective of the subparagraph under which Defendants bring their claim and what they must eventually prove under that subparagraph.

38

> "Loss" is defined in the disjunctive . . . If a plaintiff is able to establish a loss of at least $5,000 in value, whether that be composed solely of costs identified in the first clause, or solely costs identified in the second clause, or a combination of both, then he may recover under the statute.
>
> [Defendant's] actions required [Plaintiff] to investigate the offense and conduct a damage assessment, thereby causing "loss." Thus, contrary to [Defendant's] belief, it was not necessary that Plaintiffs establish that an "interruption in service" occurred.

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073–74 (6th Cir. 2014) (internal citations omitted). Despite this clear precedent from the Sixth Circuit, Plaintiff seems to argue that "loss" cannot result from incurring expenses associated with investigating the access to the page and that loss can result only from interruption of service. (Doc. No. 42 at 9). The Sixth Circuit has rejected these arguments.

In their counterclaims, Defendants pled damages under the CFAA as follows: "The General has experienced damages to its goodwill and reputation (which exceed $5,000), has been damaged by the costs and fees incurred in investigating the unauthorized access (which exceed $5,000), and the costs and fees that The General has and will incur in connection with this counterclaim." (Doc. No. 40 at 12). This is sufficient to plead "loss" under the CFAA as interpreted by the Sixth Circuit.

The statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030 at (e)(8). In regards to "damage," the Sixth Circuit noted that:

> The CFAA does not define three key terms—"impairment," "integrity," and "availability"—and therefore we look to the common meanings of these words. *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011) (citing *United States v. Plavcak*, 411 F.3d 655, 660–61 (6th Cir. 2005)). " 'Impairment' means a 'deterioration' or an 'injurious lessening or weakening.' The definition of 'integrity' includes an 'uncorrupted condition,' an 'original perfect state,' and 'soundness.' And 'availability' is the 'capability of being employed or made use of.' " *Id.* (quoting 7 Oxford English Dictionary 696, 1066 (2d ed.1989); 1 Oxford English Dictionary 812 (2d ed.1989)).

39

*Yoder & Frey Auctioneers, Inc.*, 774 F.3d at 1072 n.5.

Though Plaintiff argues that Defendants have not alleged damage, Defendants allege both that "Ms. Viera's deletion, alteration, and addition of inflammatory content to The General's LinkedIn webpage disrupted access to the legitimate data and content that had resided on The General's LinkedIn webpage" and "Ms. Viera's aforementioned conduct impaired the integrity and availability of data and information contained on The General's LinkedIn webpage (and on the protected computer) by: (a) deleting content that users should have been able to view and (b) by altering and adding improper content, in violation of the CFAA." (Doc. No. 40 at 12). This is sufficient to plead "damage" under the CFAA.

Therefore, the Court finds that Defendants have sufficiently alleged both "loss" and "damage" under the CFAA, and Defendants' CFAA counterclaim against Plaintiff will survive Plaintiff's Motion.

    2.  <u>TPCCA</u>

      a.  <u>Without authorization</u>

Plaintiff makes similar arguments attacking Defendants' claims under the TPCCA that she makes in attacking the CFAA claims. Plaintiff's first argument again is that Defendants do not allege that she acted "without authorization." (Doc. No. 42 at 10).

The TPCCA states:

> Whoever intentionally and without authorization, directly or indirectly . . . [a]lters, damages, destroys, or attempts to damage or destroy, or causes the disruption to the proper operation of any computer, or who performs an act which is responsible for the disruption of any computer, computer system, computer network, computer software, program, or data which resides or exists internal or external to a computer, computer system, or computer network is punishable as in § 39-14-105.

40

Tenn. Code Ann. § 39-14-602(b)(2). "Like the CFAA, the TPCCA is a criminal statute that also authorizes a private cause of action." *DeSoto v. Bd. of Parks & Recreation*, 64 F. Supp. 3d 1070, 1104 (M.D. Tenn. 2014).

The TPCCA defines authorization, stating that authorization is "any and all forms of consent, including both implicit and explicit consent." Tenn. Code Ann. § 39-14-601(2). Plaintiff provides the Court with no citation or argument regarding lack of authorization under the TPCCA, besides that which has already been discussed in connection with the CFAA. Plaintiff merely argues that "The General makes no allegation that [Plaintiff's] access was ever removed, restricted, or rescinded prior to the purported acts – because it was not." (Doc. No. 42 at 11).[29] However, as

---

[29] Plaintiff additionally states "[a] contrary reading of the terms 'authorization' broader than that suggested here would violate the rule of lenity." (Doc. No. 42 at 11). This appears to be another reference to the circuit split discussed above, which the Court has already decided is not relevant to the present case. Additionally, the circuit split is not relevant when discussing the state statute, as the circuit split addresses the federal statute.

Plaintiff cites the Court to no authority that the rule of lenity should be applied in a civil case when analyzing a state criminal statute that provides a civil remedy. Regardless, the Tennessee Court of Criminal Appeals has explained that:

> The rule of lenity is related to the doctrine of vagueness and the principle of fair warning. "The rule of lenity is 'rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his or her conduct is prohibited.' " *State v. Hawkins*, 406 S.W.3d 121, 137-138 (Tenn. 2013) (quoting *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010) ). Where there is ambiguity in a statue, the rule of lenity requires the ambiguity to be resolved in favor of a defendant. *State v. Smit*h, 436 S.W.3d 751, 768 (Tenn. 2014). The rule of lenity "reflects not merely a convenient maxim of statutory construction" but is based on "fundamental principles of due process[.]" *Dunn v. United States*, 442 U.S. 100, 112 (1979) . . .

> A word or phrase is ambiguous if it "can reasonably have more than one meaning[.]" *Lee Med. Inc.*, 312 S.W.3d at 527. A statute is ambiguous if the language "is susceptible [to] more than one reasonable interpretation[.]" Memphis Hous. Auth. v. Thompson, 38 S.W.3d 504, 512 (Tenn. 2001).

was already noted by the Court in discussing the CFAA claim, Defendants specifically allege in their counterclaims that: "[a]fter The General terminated Ms. Viera's employment, Ms. Viera intentionally accessed The General's LinkedIn webpage *without authorization*, using credentials that at the time (*post-termination*) she was *not permitted* to use." (Doc. No 39 at 9 (emphasis added)). As suggested above, the mere factual allegation of her prior termination makes this allegation plausible, as it by itself reasonably suggests that her authorization was implicitly revoked (by her termination).

The Court therefore is unpersuaded by Plaintiff's argument, and it finds that Defendants have plausibly alleged that Plaintiff acted without authorization for purposes of the TPCCA as well as the CFAA.

   b. Damages

Plaintiff attacks Defendants' pleading of damages under the TPCCA in two primary ways, namely by claiming that: 1) Defendants have no property interest in their LinkedIn account, and 2) Defendants have not pled actual damages recoverable under the TPCCA. (Doc. No. 42). Defendants respond by arguing that they do have a property interest in their LinkedIn account and that their damages are pled sufficiently to survive a motion to dismiss. (Doc. No. 46).

The TPCCA provides some, if hardly copious, guidance as to what constitutes damages recoverable under the TPCCA. Specifically, it provides: "Any person whose property or person is injured by reason of a violation of any provision of this part may file a civil action and recover for

---

*State v. Bowens*, No. E201702075CCAR3CD, 2018 WL 5279374, at *5 (Tenn. Crim. App. Oct. 23, 2018). Plaintiff has not pointed the Court to any ambiguity in the statute or otherwise provided the Court with briefing on why the rule of lenity should apply.

The Court will therefore decline to apply the rule of lenity.

any damages sustained and the costs of the civil action. Without limiting the generality of the term, 'damages' shall include loss of profits." Tenn. Code Ann. § 39-14-604(a).

Plaintiff first attacks Defendants' allegation of damages recoverable under the TPCCA by claiming that Defendants do not have a property interest in a LinkedIn account:

> The General did not plead any injury to The General's property that would allow it to maintain an action under the TPCCA. T.C.A. § 39-14-604 (a). The purported property that was altered here was not a computer or network owned by The General, rather that of a third-party social media platform. The General has no actionable property interests in a LinkedIn webpage that is "owned" by LinkedIn.

(Doc. No. 42 at 11). For this proposition, Plaintiff cites solely to *DeSoto*. There, the plaintiff did not dispute that a Blackberry smartphone was the property of the defendant and had been provided for her official use only. *DeSoto*, 64 F. Supp. 3d at 1105. Because there was no evidence that the Blackberry smartphone was the plaintiff's property, she could not "maintain an action against its actual owner for accessing it." *Id.* Here, however, Defendants assert that they have a property interest in the LinkedIn account, citing authority that social media accounts are property interests. (Doc. No. 46 at 9); *e.g.*, *In re CTLI, LLC*, 528 B.R. 359, 361 (Bankr. S.D. Tex. 2015) ("[B]usiness social media accounts are property of a company's bankruptcy estate."); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 995 (9th Cir. 2019) ("LinkedIn has no protected property interest in the data contributed by its users, as the users retain ownership over their profiles."). Therefore, the Court is unpersuaded by Plaintiff's argument that Defendants do not have a property interest in their LinkedIn account. Indeed, *DeSoto* stands merely for the unremarkable proposition that a claimant cannot recover based on someone improperly accessing property that is not the claimant's; *DeSoto* is of no value whatsoever in establishing that a party does not have a property interest in its LinkedIn account.

43

Next, Plaintiff argues that the damages pled by Defendants are insufficient under the statute: "[s]peculation-based harms associated with perceived damage to 'goodwill and reputation' will not suffice. Much like damages necessary to sustain an action for defamation under Tennessee law, damages under the TPCCA must be required to plead and prove actual damages – which the counterclaims simply do not." (Doc. No. 42 at 11). Plaintiff cites the Court only to *Handley v. May*, 588 S.W.2d 772, 776 (Tenn. Ct. App. 1979), an irrelevant case (issued over 20 years before the TPCCA even existed) discussing the damages standards applicable in defamation cases. Defendants cite the Court to the relevant case *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967 (M.D. Tenn. 2008), involving a defendant's motion for summary judgment, where the court found that there was a genuine issue of material fact regarding damages under the TPCCA when the plaintiff showed (among other things) that 1) it lost customers, and 2) "it sustained some minor damages in changing [an] e-mail password and in assessing the consequences of the snooping." *Id.* at 982. Although the court did not explicitly state that the latter kind of alleged damages alone would constitute damages under the TPCCA, the court appeared to imply this view. The undersigned likewise believes that "damages" under the TPCCA can include any cost and effort spent changing a password and (more significantly) assessing the consequences of the defendant's (or counter-defendant's) alleged shenanigans.

In their counterclaim under the TPCCA (as with their counterclaim under the CFAA), Defendants allege that "The General has experienced damages to its goodwill and reputation (which exceed $5,000), has been damaged by the costs and fees incurred in investigating the unauthorized access (which exceed $5,000), and the costs and fees that The General has and will

44

incur in connection with this counterclaim." (Doc. No. 40 at 13).[30] Defendants thus have alleged expenditure in assessing (investigating) Plaintiff's alleged misconduct. Therefore, the Court finds that Defendants have plausibly alleged damages (albeit not necessarily very significant damages) that could be recovered under the TPCCA.

For the reasons discussed, the Court will deny Plaintiff's Motion. As a result, Defendants' counterclaims found in its Second Amended Answer survive Plaintiff's Motion.

## CONCLUSION

For the reasons discussed herein, Defendants' Motion will be denied, and Plaintiff's Motion will be denied.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[30] The Court notes that the mention of $5,000 is irrelevant under the TPCCA (though relevant under the CFAA). This reference appears to be the result of an inappropriate cut-and-paste job by Defendants when addressing the requirements under the respective statutes.

45